IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SERGIO OMARDIAZ ALONSO,

        Petitioner,

   v.

R. BARNES, Warden,

        Respondent.

_____/

No. C 09-00429 CW (PR)

ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS;
DENYING CERTIFICATE OF
APPEALABILITY

Petitioner Sergio Omardiaz Alonso, a state prisoner, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging the following three claims: (1) there was insufficient evidence to support the gang enhancement finding; (2) the trial court violated Petitioner's due process rights by admitting prejudicial gang-related photographs; and (3) the trial court erred in instructing the jury pursuant to CALCRIM 375, which the jury likely understood to allow them to find predicate crimes under a preponderance of the evidence standard, thereby lowering the prosecution's burden of proof. (Pet. Attach. at 3-10.)

On June 30, 2009, the Court issued an Order to Show Cause why the present writ should not be granted. On December 9, 2009, Respondent filed an answer. On March 7, 2011, Petitioner filed a traverse after being granted four extensions of time to do so.

Having considered all of the papers filed by the parties, the Court DENIES the petition.

PROCEDURAL BACKGROUND

On April 12, 2006, a jury found Petitioner guilty of assault with a deadly weapon and found true an enhancement allegation that Petitioner had personally inflicted great bodily injury and

committed the offense for the benefit of a criminal street gang. Petitioner's co-defendant, Christian Antonio Garcia, was similarly convicted. The jury also found that Petitioner had previously been convicted of a felony and had served a prison term for that conviction, but the trial court dismissed the allegation pursuant to California Penal Code § 1385.[1]

On July 12, 2006, Petitioner and his co-defendant were sentenced to the middle term of three years for the assault plus consecutive sentences of ten years for the gang enhancement and three years for the great bodily injury enhancements, which is a total of sixteen years in prison.

Petitioner filed a timely appeal to the California Court of Appeal. On June 6, 2008, the appellate court affirmed the trial court's judgment.

Petitioner and his co-defendant subsequently filed petitions for review in the California Supreme Court. On September 17, 2008, the state supreme court denied both petitions for review.

On January 29, 2009, Petitioner filed the present federal habeas petition.

<div align="center">FACTUAL BACKGROUND</div>

The appellate court summarized the facts of the case as follows:

<div align="center">A. Prosecution Case</div>

<div align="center">1. Evidence of Assault</div>

On June 26, 2005, Cornelio Cordozo, his girlfriend Cecilia Cendejas, and defendants went to the flea market

---

[1] A trial court has the authority to use its discretion to strike a prior conviction, pursuant to California Penal Code § 1385, for purposes of sentencing under the California Three Strikes law provisions of California Penal Code §§ 667 and 1170.12. People v. Superior Court (Romero), 13 Cal. 4th 497, 508 (1996).

<div style="writing-mode: vertical-rl">**United States District Court**
For the Northern District of California</div>

1
2
3
4
5
6

in San Jose.  After Cordozo bought a blanket and some slippers, he asked defendants to take them to his car. At trial, Cordozo testified that Cendejas went with defendants.  However, he was impeached with a pretrial statement that he made to Detective Eric Grimes in which he stated that defendants went to the car by themselves. Cordozo testified similarly at the preliminary hearing. At trial, Cordozo explained the inconsistent statements by asserting that Cendejas did not want to become involved in the incident and thus he wanted to protect her.

7
8
9
10
11
12

At about 5:20 p.m. on the same day, Hector Rosales was closing his lunch truck that was parked outside the flea market parking lot.  Defendants walked toward Rosales, and said, "'What's up?'"  They did not say it in a friendly way.  Though they spoke loudly, they did not yell.  Based on their tone of voice, Rosales thought they were looking for a fight.  If Rosales had answered, "'What's up,'" there would have been a fight.  Rosales responded, "Nothing was up," and watched defendants as they continued walking down the street.  Rosales thought they might be in a gang, because they wore blue belts.

13
14
15
16
17
18
19
20
21

According to Rosales, Carlos Perez then walked across the street in front of Rosales's truck.  When Perez met appellants, a fight began.  Rosales did not hear either Perez or defendants say anything to each other.  He also did not see any gang gestures. According to Rosales, one of the defendants initiated the fight, and Perez fought with him first.  As Perez ran to the other side of the street, he fell down. Defendants then hit Perez's head and stomach with rocks while he was lying on the ground.  Defendants also hit and kicked Perez, who was unable to get up.  Defendants eventually went to their car.  One of them returned with an iron pipe and was about to hit Perez with it when Rosales and other bystanders shouted at him to leave Perez alone.  The other defendant arrived in the car, and both defendants left.  Rosales wrote down the license plate number of the car.

22
23
24
25

After defendants left, Rosales approached Perez, who had trouble standing.  When Rosales asked him if he was okay, Perez did not respond.  Perez did not know his name or his assailants.  He asked Rosales to help him find his car, but he did not know what color it was. When Perez tried to leave, Rosales told him to wait for medical help.

26
27
28

Maria Huerta and her husband Ignacio also observed the fight.  They were sitting in their vehicle, which was across the street from the lunch truck.  Maria saw Perez and appellants.  However, she did not hear anyone say anything, and did not see who initiated the fight. According to Maria, defendants hit Perez with rocks

after he was on the ground.  They also kicked and beat Perez.  While Alonso was fighting with Perez, Garcia left and went to his car.  Alonso then went to the car, obtained "a pipe or something," and returned to the scene of the fight.  After Maria told Alonso to leave, he entered the car that was driven by Garcia, and defendants left.

Meanwhile, Cordozo was walking around the flea market when Cendejas called him on her cell phone.  She sounded nervous, but he did not know what the trouble was.  Cordozo then received a call from Garcia, who told him where defendants would pick him up.  Defendants picked up Cordozo and Cendejas on the opposite side of the flea market from where the car had been parked.  Garcia had a bloody lip, and Alonso had no injuries.  Cordozo asked Garcia what happened.  Defendants told him that "they had a problem with this guy was shouting things to them."  When asked whether he "shout[ed] something that was gang-related," Cordozo testified, "I think he did shout out something similar to that."  Garcia also said that this person started hitting him.  Garcia told Cordozo that Alonso tried to help, that he (Garcia) was on the ground, and that this person was punching or beating him.

Cordozo's testimony was impeached by his prior statements to Grimes.  Grimes testified that Cordozo told him that defendants said that "they had been in a fight and beat a Norteño who called them scraps."  Cordozo denied that he had made this statement to Grimes.

Officer Joshua Erbes arrived at the scene at about 5:23 p.m.  Perez was bleeding from several wounds on his face and head.  Erbes interviewed Perez, who was disoriented and did not remember how the attack began, if the attacker said anything to him, or if he had done anything to provoke the attack.  Perez stated that he had been walking across the street on his lunch break when he was attacked.  Erbes collected rocks from the scene, and DNA analysis of two rocks revealed that Perez was the source of blood on both.

Perez was transported to a hospital for treatment.  His injuries were "consistent with being hit by a rock."  These injuries were: a laceration that went through his cheek into his mouth; a five-centimeter scrape above the right ear; a laceration to his ear; a contusion over his right eyebrow; and a minimal fracture to his nose.  As a result of the attack, Perez did not work for two weeks.

Officer Daniel Carley did a background check on the license plate number that was provided by Rosales.  Carley eventually located the vehicle at about 7:50 p.m.  He stopped the vehicle about five to 10 miles from the

crime scene.  Cordozo was driving, and Cendejas and defendants were passengers.  Carley collected defendants' clothing.  Garcia was wearing blue jeans, a blue belt, a hat, a white tank top, a blue shirt, and blue and white sneakers with blue laces.  He had no injuries.  Alonso was wearing a blue belt and a blue and white shirt.  DNA analysis revealed that Perez's blood was on both of Garcia's sneakers and on Alonso's shoe.

Grimes interviewed Perez two days after the incident.  Perez told him that he had left work at Pak'n Save and was driving home when two men ran up to his car, yelled, "'Sur Trece,'" and hit him with a rock. Perez got out of his car and tried to chase the men.  He did not remember anything else.  Grimes asked Perez why he thought that they had attacked him.  Perez responded that it was probably because of his tattoos.  However, the tattoos would not have been visible to anyone outside the car if Perez was driving.  Perez never admitted that he had yelled out a gang challenge.

Perez was unavailable at trial, and his testimony at the preliminary hearing was presented to the jury. Perez, who was then 22 years old, testified that he was affiliated with the Nortenos when he was between the ages of 12 and 18.  He had four dots on his fingers, but did not know what they signified.  On the day of the assault, Perez was driving a black Acura.  He was the victim of an attack, but did not remember what happened. He did not know whether he provoked the attack or how many attackers there were.  "As far as [he] kn[e]w," Perez was telling the truth when he told Grimes that two men ran up just before the attack and yelled, "'Sur Trece.'"  However, he did not remember them doing it. Perez denied recognizing his attackers in court.

### 2. Gang Evidence

Grimes testified as an expert in criminal street gangs.  He testified that Nortenos are a Hispanic gang that originated in northern California.  All Nortenos align themselves with the Nuestra Familia gang, which began in the prison system.  Nortenos associate with the color red, and wear red hats, shirts, and shoes.  They also have tattoos that consist of four dots or the numbers "1" and "4," for the 14th letter of the alpha-bet, "N."  Surenos, who are their rivals, are from Mexico or southern California.  They align themselves with the "'La Eme'" prison gang, which is the Mexican Mafia.  Surenos associate with the color blue, and wear blue hats, bandanas, belts, and shoe laces.  They also associate with the number 13, for the 13th letter of the alphabet, "M."  Nortenos and Surenos are umbrella organizations for many individual street gangs.

Both Nortenos and Surenos use gang slogans to show their allegiance to the gang.  Nortenos will shout "Norte Vida," or "Puro Norte," while Surenos will shout "Sur," or "Pur Sur."  Nortenos will also use the term "scrapa," to refer to Surenos as "a scrap," "a piece of garbage," or "dirt."

According to Grimes, an individual commits crimes in order to become a gang member.  Once he is a gang member, if someone disrespects him, he must retaliate immediately.  He must also assist a fellow gang member during an altercation.  When an assault is in progress, gang members will also shout gang slogans so that others will be aware of their strength in a given neighborhood.  If others are not around to hear the slogan, it becomes "a message to the victim" about "who beat them up."

In order for a gang to remain strong and powerful, members must take care of their neighborhood or go into their rivals' neighborhood and "beat them up, stab them, shoot them, whatever needs to be done."  Thus, they control a neighborhood by instilling fear in its residents.  A gang member enhances his reputation within his gang "by doing things for the gang, whether it's selling guns, selling drugs, making money, or committing assaults or committing any types of crimes in the name of the gang."  Gang members will not cooperate with law enforcement, because they do not want to be labeled a "rat."  If a gang member is labeled a rat, other gang members will beat him up and kick him out of the gang.

In the early 1990's, Varrio Peligrosos Locos (VPL) became a gang.  This criminal street gang has approximately 144 members, whose primary activities include robbery, assaults with deadly weapons, shootings into dwellings, vandalism, stealing vehicles, selling narcotics, and witness intimidation.  VPL associates with the number 13, "M," the 13th letter of the alphabet, and the color blue.  It uses these symbols in its tattoos, drawings, writings, and hand signs.

The prosecution also introduced evidence of defendants' affiliation with VPL.  In May 1998, Officer Oscar Ramirez contacted Alonso in VPL territory.  Alonso told him that he "hangs out with" VPL and had done so for three years.  In June 2003, Officer Anthony Vizzusi contacted Alonso during a vehicle stop.  There were VPL members in the car with Alonso.  Alonso told Ramirez that he had been associating with VPL for eight years.  He stated that he "hangs out with" VPL in VPL territory.  Alonso also had a tattoo of three dots on his hand.

On January 15, 2006, Officer Arturo Palacios contacted Garcia.  Garcia was with a member of VPL.  Garcia was wearing blue and stated that he "kick[ed] it with" VPL, but was not yet jumped in.  According to

Garcia, he was "down with Sur," and was a "wannabe."

According to Grimes, defendants were "current and validated members" of VPL based on their own admissions, police reports, field interview cards, and their tattoos and clothing.  Grimes also testified that the assault benefited [sic] the gang, because it upheld its reputation and demonstrated that defendants would not be intimidated by a rival gang member.

The prosecution introduced evidence of crimes committed by VPL members.  On March 9, 1998, Nortenos were throwing rocks at Surenos, including defendants. Surenos left and returned with reinforcements, including defendants, chased these Nortenos, and threw rocks at them.

In September 2001, VPL members, including defendants, threw bottles and Molotov cocktails at a house occupied by Nortenos.  The incident led to convictions for assault with force likely to cause great bodily injury.  Alonso was one of the defendants who was convicted.  Garcia's case was a juvenile adjudication.

On November 4, 2002, the police stopped a vehicle in which a VPL member was found in possession of a handgun and heroin that was packaged for sale.  The incident led to a conviction for gun and drug possession.  Neither defendant was involved in this offense.

On April 24, 2003, a Sureno was driving when Nortenos "mad-dogg[ed]" him, threw a rock at his car, and flashed gang signs at him.  He drove away and returned with his Sureno friends, who assaulted Nortenos and stabbed three of them.  Two of the Surenos were related to Valley Palms Surenos and one was a member of VPL.  All were sentenced to prison for assault with a deadly weapon and accompanying gang enhancements. Defendants were not involved.

B. Defense Case

Cendejas was the sole witness for the defense.  She testified that Cordozo was her boyfriend, and Alonso was her sister's boyfriend.  Cendejas saw Garcia more frequently than she saw Alonso.  Cendejas denied any familiarity with VPL or knowing anyone in it.  According to Cendejas, Cordozo's older brother Sergio was not a VPL member.

On the day of the incident, Cendejas, Cordozo, and defendants went to the flea market.  After Cordozo bought a blanket and slippers, he asked defendants to take them to the car.  Cendejas went with defendants. Since she was using her cell phone, she fell behind

United States District Court
For the Northern District of California

them.  As defendants were almost across the street outside the flea market, a guy ran toward Garcia and hit him, knocking him down.  The assailant then started hitting and swinging at Garcia.  Cendejas did not hear either defendants or the assailant say anything.  As Alonso was about to "stop it or something," Cendejas left.  She did not want to get involved and she was scared.  Cendejas returned to the flea market and called Cordozo.  After she met Cordozo, she told him that defendants had gotten into a fight.  Shortly thereafter, Garcia picked up Cendejas and Cordozo at the front gate of the flea market.  Defendants told them that they had been in a fight.  Defendants were "shaky" and Garcia had blood on his lip.

When Cendejas was questioned by the police, she said that she did not know what had happened.  She lied and did not mention that she had seen the fight, because she was scared.  Cendejas also testified regarding her interviews with Grimes.  She did not want to speak with him, because she felt that he was against defendants.  Since he told her that she could go to jail if she lied, Cendejas continued to tell the same story that she had initially told the police.  She thought that she could be arrested for lying originally.  After Cendejas spoke to a defense lawyer, she was not afraid to testify as she did at trial.

C. Rebuttal

Grimes testified that he interviewed Cendejas in August 2005 and in October 2005.  In the first interview, Cendejas told him that she stayed with Cordozo when defendants returned to the car.  Cendejas then called Garcia and they met outside the flea market. Cordozo asked them what happened, and defendants said they got into a fight.

The second interview was recorded and transcribed. The recording and transcript were admitted into evidence.  During that interview, Cendejas told Grimes that defendants took the blanket and slippers to the car while she remained at the flea market with Cordozo. Since they were taking a long time, Cendejas called Garcia.  Eventually, defendants picked them up. Cendejas knew something had happened, because defendants were "all shaken up."  Cordozo asked what happened, and appellants responded that they had gotten into a fight. They said they were walking across the street when a black car passed them, and a guy screamed out "Norte Vida."  After defendants crossed the street, the guy stopped his car, got out, and hit Garcia, who fell. Defendants did not say that they "hit them with anything."  She did not remember any injuries.

United States District Court
For the Northern District of California

1   Grimes testified that Cendejas never told him that
2   she witnessed the fight.  Though Cendejas told him in
    her second interview that the assailant was driving a
3   black car, he did not ask her how she knew the color of
    the car.  He had written in his police report that Perez
4   was driving a black car based on Perez's statement.
    Police reports are routinely turned over to the defense.

5   Grimes testified that Cordozo's brother, Sergio,
6   was affiliated with VPL, and was dating Cendejas's
    sister.  Victor Torrez, Cordozo's cousin and owner of
7   the car that Cordozo drove to the flea market, was also
    a member of VPL.

8   (People v. Garcia (Op.), No. H030428, 2004 WL 2316307 (Cal. Ct.

9   App. Jun. 6, 2008) at *1-7.)

10                          LEGAL STANDARD

11       A federal court may entertain a habeas petition from a state

12   prisoner "only on the ground that he is in custody in violation of

13   the Constitution or laws or treaties of the United States."  28

14   U.S.C. § 2254(a).  Under the Antiterrorism and  Effective Death

15   Penalty Act of 1996 (AEDPA), a district court may not grant habeas

16   relief unless the state court's adjudication of the claim:

17   "(1) resulted in a decision that was contrary to, or involved an

18   unreasonable application of, clearly established Federal law, as

19   determined by the Supreme Court of the United States; or

20   (2) resulted in a decision that was based on an unreasonable

21   determination of the facts in light of the evidence presented in

22   the State court proceeding."  28 U.S.C. § 2254(d); Williams v.

23   Taylor, 529 U.S. 362, 412 (2000).  The first prong applies both to

24   questions of law and to mixed questions of law and fact, id. at

25   407-09, and the second prong applies to decisions based on factual

26   determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

27       A state court decision is "contrary to" Supreme Court

28   authority, that is, falls under the first clause of § 2254(d)(1),

                                     9

United States District Court
For the Northern District of California

only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. Id. at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El, 537 U.S. at 340.  A petitioner must present clear and convincing evidence to overcome the presumption of correctness under § 2254(e)(1); conclusory assertions will not do. Id.  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S.

619, 638 (1993)).

When there is no reasoned opinion from the highest state court to consider a petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of section 2254(d).  Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).  In the present case, the California Court of Appeal is the highest court that addressed Petitioner's claims.

<div align="center">DISCUSSION</div>

I.   Insufficiency of Evidence for Gang Enhancement

California law provides for a sentence enhancement for crimes committed "for the benefit of, at the direction of, or in association with any criminal street gang."  Cal. Penal Code § 186.22(b)(1).  Petitioner claims there was insufficient evidence to support the gang enhancement finding.  Specifically, he argues that there was insufficient evidence that: (1) the assault was gang-related; (2) he had the requisite specific intent to promote, further, or assist criminal gang behavior; and (3) VPL's primary activities include criminal activity set out in California Penal Code § 186.22.  (Pet. Attach. at 3.)

A state prisoner who proves that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt is entitled to habeas relief.  Jackson v. Virginia, 443 U.S. 307, 324 (1979).  A federal court reviewing collaterally a state conviction, however, must view the evidence produced at trial "in the light most favorable to the prosecution."  Id. at 319.  Only if no rational trier of fact could have found

United States District Court
For the Northern District of California

proof of guilt beyond a reasonable doubt, may the federal court grant a writ. Id. at 324. This standard of review and deference applies to both convictions and sentencing enhancements. Garcia v. Carey, 395 F.3d 1099, 1102 (9th Cir. 2005) (granting habeas relief because there was no evidence that robbery furthered other gang criminal activity, an element of the gang sentencing enhancement in Cal. Pen. Code § 186.22(b)(1)). Where a state court has addressed a sufficiency of the evidence claim on the merits, a federal habeas court must only ask whether that court's decision reflected an unreasonable application of Jackson to the facts of the case. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).

   A.   Gang-Related

   Petitioner claims that he went to the flea market for the legitimate purpose of accompanying friends who were shopping, that the crime did not pertain to any gang territory, that Perez was not identifiable as an alleged rival gang member because his tattoos were not immediately visible to Petitioner while Perez was in his vehicle, and that bystanders did not hear any gang slogans. (Pet. Attach. at 6.) Therefore, Petitioner argues that there was insufficient evidence that the assault on Perez was gang-related.

   The appellate court described the applicable law as follows:

> Generally, "[t]he proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (People v. Jones (1990) 51 Cal.3d 294, 314.) We also review "the evidence in the light most favorable to the prosecution, and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (People v. Griffin (2004) 33 Cal.4th 1015, 1028.) The substantial evidence standard applies to a claim that the evidence was insufficient to support a gang enhancement finding. (People v. Vy (2004) 122

Cal.App.4th 1209, 1224.)

Any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished" by an additional term of ten years if the felony is a violent felony. Cal. Pen. Code § 186.22(b)(1). "Based on section 186.22, a crime fails to be gang related unless [the defendant] committed it for the benefit of, at the direction of, or in association with a street gang." (In re Frank S. (2006) 141 Cal.App.4th 1192, 1199 (Frank S.), internal quotation marks omitted).

Op. at *9.

In rejecting this claim, the appellate court stated:

. . . defendants have overlooked the evidence that does support the gang enhancement finding.  Here, defendants, who were members or affiliates of VPL, were wearing blue clothing that displayed their status as Surenos.  As they walked towards Rosales, they said, "'What's up?'" Their tone of voice indicated to Rosales that they were looking for a fight.  Rosales knew that there would have been a fight if he had responded by saying, "'What's up?'"  Thus, he avoided eye contact and said that nothing was up.  Based on this evidence, the jury could reasonably conclude that defendants were looking for trouble as they left the flea market.  At this point, though Rosales and other bystanders did not hear any gang slogans, Perez identified himself as a Norteno to defendants.  Defendants told Cordozo that "they had a problem with this guy" who "[s]shout[ed] something that was gang-related."  Cordozo had also told Grimes that defendants told him that they "beat a Norteno who called them scraps."[FN2]

[FN2.] Though Grimes testified that he did not believe Cordozo's statements that Perez yelled gang slogans and thus these statements did not affect his opinion as to how the attack began, the jury was not required to accept this portion of his testimony.  (People v. Rush (1960) 180 Cal.App.2d 885, 886-887.)

Cendejas told Grimes that defendants told her that a guy in a black car passed them and yelled, "Norte Vida." Based on this evidence, it was irrelevant that defendants were unable to view Perez's tattoos and that Perez was not wearing red clothing.  Though bystanders did not hear any gang slogans, the jury could have

13

United States District Court
For the Northern District of California

reasonably concluded that defendants knew that Perez was a Norteno, because he had challenged them as Surenos by shouting out a gang slogan.  Thus, there was substantial evidence to support the finding that the assault was gang-related.

Op. at *9.

Based on the ferocity of the assault and testimony of the gang expert, such an assault could reasonably be interpreted as both benefitting the gang by upholding its reputation and showing a lack of intimidation; a rational juror could have concluded beyond a reasonable doubt that the assault was gang-related.  <u>Jackson</u>, 443 U.S. at 319.  The appellate court's decision was therefore not an unreasonable application of <u>Jackson</u>, and Petitioner's argument that the assault was not gang-related is unavailing.

B.   Requisite Intent

Petitioner contends that the gang enhancement finding lacks evidentiary support to show that Petitioner acted with the requisite specific intent.

The appellate court rejected this claims as follows:

The prosecution was required to prove that defendants had the "specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."  (§ 186.22, subd. (b)(1).)  "[M]ere membership in a gang" is insufficient to prove the specific intent element of section 186.22.  (<u>People v. Gardeley</u> (1996) 14 Cal.4th 605, 622-623 (<u>Gardeley</u>).)  Here, however, the prosecution introduced additional evidence to prove the gang enhancement.  Defendants were wearing blue, thus announcing their status as Surenos as they walked down the street.  Perez then yelled, "Norte Vida," and called them "scraps."  According to expert testimony, there was intense rivalry between Surenos and Nortenos, Nortenos will shout "Norte Vida" to show their allegiance to their gang, gang members were required to retaliate immediately if a rival gang member disrespected them, "scraps" was a derogatory term for Surenos, gang members were required to assist a fellow gang member during an altercation, and gang members who assisted each other in an assault were furthering the legacy of their gang.  Thus, when Perez insulted

14

United States District Court
For the Northern District of California

defendants, and one of the defendants began fighting
with Perez, the other defendant was required to and did
assist him.  After Perez fell, both defendants hit
Perez's head and stomach with rocks, thereby assisting
each other in criminal conduct.  Based on this record,
there was substantial evidence that defendants were gang
members and that each defendant had the specific intent
to assist the other in assaulting a rival gang member.
(See People v. Morales (2003) 112 Cal.App.4th 1176,
1198.)

The case of Frank S., supra, 141 Cal.App.4th 1192,
upon which defendant relies, is factually
distinguishable.  In Frank S., a police officer detained
a minor after he rode his bicycle through a red light.
The minor, who had a knife and a bindle of
methamphetamine and was wearing a red bandana, told the
officer that he carried the knife for protection against
Southerners, because they believed he supported Northern
street gangs.  An expert witness for the prosecution
testified that the minor would use the knife to protect
himself from rival gang members and to assault these
individuals.  (Id. at pp. 1195-1196.)  The reviewing
court held that there was insufficient evidence to
support the specific intent element of the gang
enhancement.  (Id. at p. 1196.)  Frank S. is factually
distinguishable from the present case.  In that case,
the minor, who was alone, only possessed the knife and
the drugs.  Thus, the prosecution was required to prove
that the minor intended to use the knife or drugs to
assist another gang member in committing another crime,
and this evidence did not exist.  In contrast to Frank
S., here, defendants intended to assist each other in
assaulting a rival gang member.

Op. at *10.

Pursuant to the Jackson standard, a petitioner can obtain

habeas relief if no rational trier of fact could find the elements

of the enhancement true beyond a reasonable doubt.  Garcia, 395

F.3d at 1102; see, e.g., id. (granting habeas relief because there

was no evidence that robbery furthered other gang criminal

activity, an element of the gang sentencing enhancement in Cal.

Pen. Code § 186.22(b)(1)); Briceno v. Scribner, 555 F.3d 1069,

1078-79 (9th Cir. 2009) (gang expert testimony about behavior and

traits of defendant's gang could not and did not help to establish

**United States District Court**
For the Northern District of California

defendant's specific intent for purposes of gang sentencing enhancement in Cal. Penal Code § 186.22(b)(1)).

Subsequently, the California Supreme Court expressly disapproved of the Ninth Circuit's interpretation of California Penal Code § 186.22(b)(1) in <u>Briceno</u> and <u>Garcia</u>, and held that "'the specific intent to promote, further, or assist in any criminal conduct by gang members [] is unambiguous and applies to any criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced.'" <u>Emery v. Clark</u>, 643 F.3d 1210, 1215 (9th Cir. 2011) (quoting <u>People v. Albillar</u>, 244 P.3d 1062, 1075 (Cal. 2010) (finding its prior interpretations of § 186.22(b)(1) as set forth in <u>Briceno</u> and <u>Garcia</u> were overruled by <u>Albillar</u> and affirming denial of federal petition where there was ample evidence showing that petitioner committed the crimes of conviction with the specific intent to "assist in" criminal conduct by gang members)).

The expert testimony presented in the present case is relevant in assessing Petitioner's specific intent to promote, further, or assist a criminal street gang in criminal conduct. The expert testimony described the nature of the feud between Nortenos and Surenos and how Petitioner's actions assisted the criminal gang, VPL.

Considering the evidence that the assault was gang-related, and considering the expert testimony that Petitioner had an obligation to assist in the criminal conduct that his fellow gang-member and co-defendant, Garcia, was engaged in, the appellate court reasonably concluded that a rational juror could decide that

1    Petitioner had the requisite specific intent to satisfy that

2    element of section 186.22(b)(1).   Therefore, Petitioner's argument

3    that he lacked the requisite specific intent to commit the

4    underlying offense fails, and the appellate court's rejection of

5    his claim was reasonable.

6        C.   Pattern of Criminal Activity

7        Petitioner contends that there was insufficient evidence to

8    establish that VPL was engaged in a pattern of criminal activity

9    and that VPL's primary activities did not fall within the ambit of

10   California Penal Code § 186.22.

11   The appellate court rejected his claim, stating:

> Section 186.22 defines a "criminal street gang" as "a group of three or more persons" that has as "one of its primary activities the commission of one or more of the criminal acts enumerated" in the statute. (§ 186.22, subd. (f).) It must also have "a common name or common identifying sign or symbol" and its members must "engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)
>
> "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.]" (People v. Sengpadychith (2001) 26 Cal.4th 316, 323 (Sengpadychith).)  Proof that a "group's members consistently and repeatedly have committed criminal activity listed in the gang statute" is sufficient to establish the gang's primary activity. (Id. at p. 324.)  The occasional commission of crimes by the gang's members, however, is insufficient.  (Ibid.) The trier of fact may consider past offenses and the charged offenses in determining whether the primary activity element is satisfied.  (Id. at pp. 320, 323.) Expert testimony also may be used to establish that one of the group's primary activities is the commission of statutorily enumerated offenses.  (Id. at p. 324; Gardeley, supra, 14 Cal.4th at pp. 617-620.)
>
> Defendants argue that there was insufficient evidence that VPL's primary activity was the commission of the statutorily enumerated offenses, because VPL committed only three crimes during a period of 16 years. The record does not support this argument.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Here, Grimes testified that VPL's primary activities are "robbery, assault with a deadly weapon, shooting into inhabited or uninhabited dwelling[s], vandalism[,] which would include graffiti, stealing vehicles, selling narcotics, witness intimidation."  The majority of these crimes are statutorily enumerated offenses.  (§ 186 .22, subd. (e)(1) [assault with a deadly weapon or by means of force likely to produce great bodily injury], (2) [robbery], (4) [sale of narcotics], (5) [shooting at an inhabited dwelling], (8) [witness intimidation], (20) [felony vandalism].  Grimes also testified that VPL has "committed multiple offenses that are covered under 186[.]22 PC[,] which is the gang enhancement."  Grimes further testified that there was documentation that VPL committed "numerous other offenses" in addition to the three predicate offenses.  Based on this expert witness testimony and the evidence of the predicate offenses, there was sufficient evidence that the primary activity of the VPL was the commission of the enumerated offenses in section 186 .22.  (Gardeley, supra, 14 Cal.4th at p. 620.)[FN3]

[FN3.] On cross-examination, Grimes agreed that "there are a lot of other crimes that VPL committed in their life history that aren't" listed in section 186.22.  Grimes also could not specify how many of the crimes listed in section 186.22 were committed by VPL.  However, an expert witness who testifies regarding a gang's primary activities is not required to specify the number of such crimes that the gang has committed.  (See Gardeley, supra, 14, Cal.4th at p. 620.)

The case of People v. Perez (2004) 118 Cal.App.4th 151, is inapposite.  In Perez, the court held that "evidence of the retaliatory shootings of a few individuals over a period of less than a week, together with a beating six years earlier, was insufficient to establish" the primary activities element of section 186.22.  (Id. at p. 160.)  However, unlike in the present case, there was no expert witness testimony regarding the gang's primary activities.  (Ibid.)

Defendants' reliance on People v. Duran (2002) 97 Cal.App.4th 1448, is similarly misplaced.  In Duran, the defendants challenged the sufficiency of the evidence to support a gang enhancement finding on the ground that the expert witness testified that "the gang's primary activity was 'putting fear into the community,'" which was not one of the statutorily enumerated offenses.  (Id. at p. 1464.)  The reviewing court concluded otherwise, stating that the witness also referred to robbery, assault, and narcotics sales, and that the gang committed these offenses often enough to gain control of the narcotics trade in a particular neighborhood.  (Id. at p. 1464.)  Contrary to defendants' claim, the Duran court did not hold that the primary activities element

1  requires proof of the effect of these activities, such
2  as provision of financial support, control of a
   neighborhood, or intimidation of the local community.

3  Op. at *11-12.

4      It is decisive here that a federal "sufficiency of the
5  evidence" inquiry is channeled by state law -- although federal law
6  requires sufficient evidence, it is state law that sets out the
7  elements as to which there must be sufficient evidence.  Sarausad
8  v. Porter, 479 F.3d 671, 678 (9th Cir. 2007) (Jackson standard must
9  be applied with explicit reference to the substantive elements of
10 the criminal offense as defined by state law), reversed on other
11 grounds by Waddington v. Sarausad, 555 U.S. 179 (2009).  "The
12 phrase 'primary activities,' as used in the [California] gang
13 statute, implies that the commission of one or more of the
14 statutorily enumerated crimes is one of the group's 'chief' or
15 'principal' occupations."  People v. Sengpadychith, 26 Cal. 4th
16 316, 323 (2001).  Proof that a "group's members consistently and
17 repeatedly have committed criminal activity listed in the gang
18 statute" is sufficient to establish the gang's primary activity.
19 Id. at 324.  In order to determine whether the primary activity
20 element is satisfied, the trier of fact may consider past offenses
21 and the charged offenses.  Id. at 320, 323; People v. Duran, 97
22 Cal. App. 4th 1448, 1465 (2002).  Expert testimony, such as the
23 testimony at issue here, may be used to establish that one of the
24 group's primary activities is the commission of statutorily
25 enumerated offenses.  Sengpadychith, 26 Cal. 4th at 324; People v.
26 Gardeley, 14 Cal. 4th 605, 617-20 (1996).

27     In the present case, the appellate court's rejection of
28 Petitioner's claim was reasonable.  As explained above,

Grimes agreed that VPL committed more crimes than the three that he testified about.  Thus, the appellate court determined that a rational juror could reasonably believe that VPL's primary activities included other statutorily enumerated offenses and not just the three crimes, as Petitioner argued.  Therefore, the Court finds unavailing Petitioner's argument that VPL was not engaged in a pattern of criminal activity and that its primary activities did not fall within the ambit of California Penal Code § 186.22.

In sum, based on the above findings, the Court DENIES Petitioner's claim that there was insufficient evidence to support the gang enhancement.  Petitioner is not entitled to habeas relief on this claim.

II.  Admission of Gang-Related Photographs

Petitioner claims that the trial court abused its discretion by admitting four gang-related photographs.

The following factual background for this claim has been taken from the appellate court's decision:

> The prosecutor sought to admit four photographs that depicted gang graffiti and a gang member throwing gang signs.  People's exhibit 32 showed a wall with the letters "VPL" and the words "Varrio Peligrosos Locos" in stylized blue script.  People's exhibit 33 showed writing on a cement wall underpass along train tracks behind Genie Avenue.  The writing said "VPL" above the words "Peach Court Killa," which was crossed out with a large "X."  "Peach Court" is a Norteno gang whose territory was less than a mile away.  When VPL crossed out the rival gang's name, VPL was issuing a challenge, that is, telling Peach Court that VPL did not want the other gang in its territory.  People's exhibit 34 showed "VPL" with "X3" next to it among various other Sureno gangs, thus showing solidarity with them.  People's exhibit 35 showed a person wearing a blue shirt and making a gang sign of the "P" and "L" of Peligrosos Locos. The person's face was whited out.  "VPL" was written on the walls behind him.
>
> Defendants objected to the admission of these exhibits on the grounds of "relevance . . . .  Evidence

20

**United States District Court**
For the Northern District of California

Code 352."  Following the prosecutor's relevancy
argument, the trial court overruled defendants'
objections, and explained: "They are relevant to any
gang-related case.  One of the things that the officer,
as an expert, has to prove is that as he discusses the
gangs -- he will be discussing gangs, about the rivalry
between Norteno and Surenos which the evidence shows is
one of the issues in this particular case and having the
exhibit that illustrates that is more helpful to the
jury.  Also having the exhibit with gang-related
graffiti is part of the gang culture based on my own
personal experience with gangs and, therefore, I find
them both relevant and signs and symbols [such] as the
throwing up the sign for this particular gang as long as
the face has been whited out, I think this also simply
is another exhibit to illustrate that, because without
some sort of symbol illustrated, it -- it's hard for a
layperson to understand that kind of testimony that the
officer's going to be giving."  The trial court also
stated: "I've done a 352 analysis of it.  I think it's
more probative than prejudicial.  I think it will be
helpful for the jury.  I don't think it's an undue
consumption of time.  I don't think it will be confusing
to them.  I think it will be helpful to them."

Op. at *12.

Petitioner argues that because he was not pictured in or

specifically linked to the challenged photographs: (1) they were

not relevant; (2) they did not personally incriminate him; and

(3) their admission was a violation of his due process rights,

which rendered his trial fundamentally unfair.

The appellate court rejected this claims as follows:

Evidence Code section 350 bars evidence that is not
relevant.  "Relevant evidence" is defined as
"evidence, . . . having any tendency in reason to prove
or disprove any disputed fact that is of consequence to
the determination of the action."  (Evid. Code § 210.)
A defendant who pleads not guilty puts in issue all
elements of the charged offense.  (People v. Balcom
(1994) 7 Cal.4th 414, 422.)  "The court in its
discretion may exclude evidence if its probative value
is substantially outweighed by the probability that its
admission will (a) necessitate undue consumption of time
or (b) create substantial danger of undue prejudice, of
confusing the issues, or of misleading the jury."
(Evid.Code, § 352.)  This court reviews a trial court's
determination under Evidence Code section 352 under the
abuse of discretion standard.  (People v. Crittenden
(1994) 9 Cal.4th 83, 133-134.)

Defendants argue that the photographs did not identify defendants by their gang monikers or show them with fellow gang members, were not found in their bedrooms, and did not connect them to the charged crime, and thus they were irrelevant. We disagree, because the photographs had some tendency to prove material issues in the case. The prosecution was required to prove that VPL had "a common name or common identifying sign or symbol," which is one of the requirements for a criminal street gang finding. (§ 186.22, subd. (f).) Exhibits 32 and 35 supported Grimes's testimony on this element. Also, at issue in the present case was why defendants might have committed such a vicious assault. Exhibit 33 was an illustration of the rivalry between VPL and the Nortenos. As Grimes explained, "By VPL crossing out the rival gang, it is a direct challenge to them saying we don't want you in our neighborhood." Exhibit 34 showed the letters "VPL" with the names of several other Sureno gangs. According to Grimes, this photograph illustrated "solidarity between the Sureno gangs. They all tend to get along together. Surenos as a whole will support one another when it comes to their rivals against the Norteno." Exhibits 33 and 34 supported Grimes's testimony regarding the rivalry between defendants' gang and Nortenos, and provided a possible motive in the present case. Thus, the trial court did not abuse its discretion in concluding that the probative value of this evidence outweighed its prejudicial effect.

Defendants argue, however, that this evidence was unduly prejudicial, because it "highlighted the violent propensities of gangs." We disagree. There is nothing violent about gang graffiti and throwing gang signs. Defendants also refer to Grimes's testimony that "if [VPL members] have weapons, they will take pictures holding weapons." However, none of the photographs include weapons.[FN4]

[FN4.] To the extent that defendants are objecting to Grimes's testimony, they have forfeited the issue on appeal because they did not object to it at trial. (Evid. Code, § 353; People v. Ghent (1987) 43 Cal.3d 739, 766.)

Defendants next claim that exhibit 33's reference to "Peach Court Killa" (italics added) was extremely prejudicial due to its "negative connotations." We find no merit to this claim, because the reference was to a Norteno gang, not defendants' gang.

Defendants' reliance on People v. Bojorquez (2002) 104 Cal.App.4th 335 (Bojorquez) is misplaced. In Bojorquez, the defendant was charged with robbery, false imprisonment, and gun enhancement allegations. (Id. at p. 337.) After the defendant testified that he no

United States District Court
For the Northern District of California

1    longer belonged to a gang (Id. at p. 340), the trial
2    court admitted expert testimony regarding the
     defendant's gang membership and an extensive description
3    of the violent nature of the gang's activities and
     beliefs.  (Id. at p. 341.)  The reviewing court held
4    that some of the evidence was relevant to impeach the
     defendant's credibility, and thus admissible, but the
5    remaining evidence had little probative value.  (Id. at
     p. 343.)  In contrast to Bojorquez, here the prosecution
6    was required to prove the elements of a gang
     enhancement.

7        Defendants argue that "[o]nce the inflammatory gang
8    evidence was admitted, it was impossible for [them] to
     obtain a fair trial on the gang allegation because there
9    was no connection between the crime and the gang
     photographs and because the prejudicial evidence
10   undermined [their] claim that the assault was not
     gang-related-the Achilles heel of the prosecution's
11   case."  We reject this argument for the same reasons
     that we have rejected defendants' state law claim.

12   Id. at *13-14.

13       The admission of evidence is not subject to federal habeas

14   review unless a specific constitutional guarantee is violated or

15   the error is of such magnitude that the result is a denial of the

16   fundamentally fair trial guaranteed by due process.  See Henry v.

17   Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784

18   F.2d 984, 990 (9th Cir.), cert. denied, 479 U.S. 839 (1986).  The

19   Supreme Court "has not yet made a clear ruling that admission of

20   irrelevant or overtly prejudicial evidence constitutes a due

21   process violation sufficient to warrant issuance of the writ."

22   Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding

23   that trial court's admission of irrelevant pornographic materials

24   was "fundamentally unfair" under Ninth Circuit precedent but not

25   contrary to, or an unreasonable application of, clearly established

26   Federal law under section 2254(d)).  See Walters v. Maass, 45 F.3d

27   1355, 1357 (9th Cir. 1995).

28       In the present case, the appellate court decision did not

23

United States District Court
For the Northern District of California

contradict or unreasonably apply federal law, because admission of the gang-related evidence did not render the trial fundamentally unfair.  See id.  As the appellate court explained, "[T]he photographs had some tendency to prove material issues in the case."  Op. at *13.  For example, the prosecution was required to prove that VPL had "a common name or common identifying sign or symbol."  Cal. Pen. Code § 186.22.  In addition, the photograph depicting "Peach Court Killa" crossed out with "VPL" written above it illustrated why Petitioner may have committed such a vicious assault.  Op. at *12.  The photograph that showed the letters "VPL" along with other Sureno gangs illustrated the solidarity between Sureno gangs and their obligation to support one another against their rivals.  Id.

Petitioner also argues that because an impermissible inference could be drawn from the photographs, it is the only inference that the jury could have drawn.  However, so long as the jury may draw some permissible inference from the evidence, its admission does not violate due process.  Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).  Moreover, the determination of whether evidence, while being relevant, is prejudicial is a question of state law beyond the purview of a federal habeas court.  Estelle v. McGuire, 502 U.S. 62, 68 (1991).  In any case, Petitioner falsely assumes that the photographic evidence should be considered irrelevant simply because it could have been prejudicial.  Because the jury was capable of drawing permissible inferences from the photographs submitted to prove material issues in the present case, and because the appellate court did not consider the admission of these photographs to be prejudicial, the Court finds unavailing

1   Plaintiff's argument that the admission was in violation of his due

2   process rights.   Accordingly, Petitioner's claim relating to the

3   admission of these gang-related photographs is DENIED.

4   III.  Instructing Jury with CALCRIM 375

5       Petitioner claims that the state trial court abused its

6   discretion in instructing the jury pursuant to CALCRIM 375.

7       The appellate court described the factual background of this

8   claim as follows:

9       [CALCRIM 375] allowed the jury to consider evidence
    of uncharged offenses for the purpose of proving intent
10   or motive, if it found that the prosecution had proved
    by a preponderance of the evidence that the defendants
11   had committed them.   The jury instruction on the gang
    enhancement allegation also referred to the uncharged
12   offenses.   Thus, defendants claim that CALCRIM 375
    allowed the jury to find an element of the gang
13   enhancement allegation, that is, that VPL had a pattern
    of criminal activity, by a preponderance of evidence
14   rather than beyond a reasonable doubt.

15      Since defendants were charged with committing the
    assault for the benefit of a criminal street gang
16   (§ 186.22(b)(1)(C)), the trial court instructed the jury
    pursuant to CALCRIM 1401.   This instruction defined a
17   criminal street gang, in relevant part, as an
    organization "whose members, whether acting alone or
18   together, engage in or have engaged in a pattern of
    criminal gang activity."   The jury was instructed that
19   one of the elements of a pattern of criminal activity
    was the "commission of, or attempted commission of, a
20   conspiracy to commit or solicitation to commit, or
    conviction of, or any combination of two or more of
21   following crimes: 1, assault with a deadly weapon;
    2, assault with force likely to produce great bodily
22   injury; 3, sales, transportation or distribution of
    controlled substances."   The trial court also instructed
23   the jury: "You may not find that there was a pattern of
    criminal gang activity unless all of you agree that two
24   or more crimes that satisfies the requirement, were
    committed, but do not have to all agree on which crimes
25   were committed.   [¶]   To decide whether a member of the
    gang or the defendant committed, 1, assault with a
26   deadly weapon; 2, assault with force likely to produce
    great bodily injury; 3, sales, transportation or
27   distribution of controlled substances, please refer to
    the separate instructions I have given you on this case.
28   [¶]   *The People have the burden of proving each
    allegation beyond a reasonable doubt.*   [¶]   If the

25

People have not met this burden, . . . you must find
that the allegation has not been proved." (Italics
added.)

The trial court also instructed the jury pursuant
to CALCRIM 375 as follows: "The People presented
evidence that the defendant committed other offenses
that were not charged in this case. You may *consider*
this evidence only if the People have proved, by
preponderance of the evidence, that the defendant, in
fact, committed the uncharged offenses. [¶]  Proof by
preponderance of the evidence is a different burden of
proof than proof beyond a reasonable doubt. [¶]  A fact
is proven by a preponderance of the evidence if you
conclude that it is more likely than not that the fact
is true. [¶]  If the People have not met this burden,
you must *disregard* this evidence entirely. If you
decide that the defendant committed the uncharged
offenses, you may, but are not required to, *consider*
that evidence for the limited purpose of deciding
whether or not the defendant acted with the intent to
commit the crime for the benefit of, at the direction
of, or in association with a criminal street gang; and
the defendant intended to assist, further, or promote
criminal conduct by gang members in this case; or, the
defendant had a motive to commit the gang allegation
alleged in this case. [¶]  Do not *consider* this
evidence for any other purpose except for the limited
purpose, which has been indicated. [¶]  Do not conclude
from this evidence that the defendant has a bad
character or is disposed to commit crime. [¶]  If you
conclude that the defendant committed the uncharged
offenses, that conclusion is only one factor to
consider, along with all the other evidence. *It is not
sufficient by itself to prove the defendants guilty of
the gang allegation. [¶]  The People must still prove
each element of the charge and allegation beyond a
reasonable doubt.*" (Italics added.)

Op. at *6-7.

The appellate court rejected Petitioner's claim, as follows:

"Whether instructions are correct and adequate is
determined by consideration of the entire charge to the
jury." People v. Holt, 15 Cal. 4th 619, 677 (1997). In
considering the instructions as a whole, a reviewing
court must determine whether there is a "'reasonable
likelihood'" that the jury understood the instructions
in the manner proposed by the defendant. Estelle, 502
U.S. 62, 72 (1991).

Defendants argue that CALCRIM 375 improperly
"discussed prior uncharged predicate offenses that the
jury reasonably could assume related to the 'pattern of
criminal activity' element of the gang enhancement." In

26

United States District Court
For the Northern District of California

our view, however, CALCRIM 375 distinguishes between the preliminary question of whether to consider evidence and the ultimate question of whether every element of the enhancement allegation had been proven beyond a reasonable doubt.   Here, CALCRIM 375 instructed the jury to apply a preponderance of the evidence standard to the issue of whether to consider the evidence of the uncharged offenses.   The instruction did not state that the jury could find any element of the gang enhancement allegation by a preponderance of the evidence.   Instead, it specifically stated that the People must prove each element of the gang allegation beyond a reasonable doubt.   The other instructions supported this conclusion.   CALCRIM 1401 outlined the elements of the gang allegations and told the jury that the People were required to prove the gang allegation beyond a reasonable doubt.   Thus, there was not a reasonable likelihood that the jury would have applied the incorrect standard.

Id. at *7.

The appellate court also rejected Petitioner's reliance on Francis v. Franklin, 471 U.S. 307 (1985), and Gibson v. Ortiz, 387 F.3d 812 (9th Cir. 2004) overruled in part on other grounds by Byrd v. Lewis, 566 F.3d 855, 866 (9th Cir. 2009), stating:

Defendants' reliance on Francis v. Franklin (1985) 471 U.S. 307 is misplaced.   In Franklin, the defendant, who was an inmate, shot an individual while attempting to escape.   (Id. at pp. 309-310.)   The defense theory was that he fired the gun inadvertently, and thus did not intend to shoot the victim.   (Id. at p. 311.)   On appeal, he argued that the instructions regarding intent to kill lessened the prosecution's burden of proof.   (Id. at p. 313.)   The challenged instructions were: "'(1) [t]he acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted' and (2) '[a] person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts but the presumption may be rebutted.'"   (Id. at p. 309.)   The United States Supreme Court held that the instructions impermissibly shifted the burden of proof by directing "the jury to presume an essential element of the offense -- intent to kill -- upon proof of other elements of the offense-the act of slaying another." (Id. at p. 316.) In contrast to Franklin, here, as previously discussed, CALCRIM 375 did not conflict with the "burden of proof" instruction.

In Gibson, the Ninth Circuit reversed the defendant's convictions after it determined that the

27

jury instructions regarding prior sexual offenses permitted the jury to convict the defendant under the preponderance of the evidence standard. <u>Gibson</u>, 387 F.3d at 822-23. The challenged instructions were former CALJIC No. 2.50.01 (6th ed. 1996) and CALJIC No. 2.50.1. These instructions stated: "If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit the same or similar type sexual offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused . . . . [¶] Within the meaning of the preceding instructions, the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed sexual offenses and/or domestic violence other than those for which he is on trial." <u>Id.</u> at 821-22. The court concluded that "the interplay of the two instructions allowed the jury to find that Gibson committed the uncharged sexual offenses by a preponderance of the evidence and thus to infer that he had committed the charged acts based upon facts found not beyond a reasonable doubt, but by a preponderance of the evidence." <u>Id.</u> at 822.

We first note that CALJIC No. 2.50.01 has been modified to include the following paragraph: "However, if you find by a preponderance of the evidence that the defendant committed [a] prior sexual offense[s], that is not sufficient by itself to prove beyond a reasonable doubt that [he] [she] committed the charged crime[s]. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime." (CALJIC No. 2.50.01 (7th ed. 1999)) This revised instruction has been found to comport with due process. <u>See</u> <u>People v. Falsetta</u>, 21 Cal.4th 903 (1999). The present case, unlike <u>Gibson</u>, included instructions that were similar to the revised CALJIC No. 2.50.01. These instructions explained to the jury how to apply the preponderance of the evidence standard to the preliminary determination of whether defendants committed any uncharged offenses while also advising the jury that the prosecution was required to prove the elements of the gang enhancement beyond a reasonable doubt. Thus, <u>Gibson</u> is distinguishable from the present case.

Op. at *8-9.

The Due Process Clause of the Fourteenth Amendment requires the prosecution to prove every element charged in a criminal

offense beyond a reasonable doubt.  <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  The state may adopt a rule that makes it easier for it to meet the requirement of proof beyond a reasonable doubt, so long as the rule does not shift or reduce the burden of proof or otherwise violate a principle of fairness contained in the Due Process Clause.  <u>See</u> <u>Montana v. Egelhoff</u>, 518 U.S. 37, 54-55 (1996).

An allegation that a jury instruction is incorrect under state law does not form a basis for federal habeas corpus relief. <u>Estelle</u>, 502 U.S. at 67.  In reviewing an ambiguous instruction, the appropriate inquiry is whether there was "a reasonable likelihood" that the jury applied the instruction in a way that relieved the State of its burden to prove every element of the crime beyond a reasonable doubt.  <u>Id.</u> at 72 (quoting <u>Boyde v. California</u>, 494 U.S. 370, 380 (1990)).  There is a reasonable likelihood that a jury's application of the challenged instruction violated the Constitution if its use "'so infected the entire trial that the resulting conviction violates due process.'"  <u>Estelle</u>, 502 U.S. at 72 (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973)).

Moreover, a petitioner must show not only that there was a reasonable likelihood that the jury misapplied the law in a way that violated the Constitution, but also that the state court was unreasonable in deciding otherwise.  <u>Estelle</u>, 502 U.S. at 72; <u>Middleton v. McNeil</u>, 541 U.S. 433, 436 (2004) (per curiam) (quoting <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam)); <u>Lisenba v. California</u>, 314 U.S. 219, 228 (1941).  The instruction "must be considered in the context of the instructions as a whole and the trial record."  <u>Estelle</u>, 502 U.S. at 67 (citing <u>Cupp</u>, 414 U.S. at

United States District Court
For the Northern District of California

1   147).

2      Petitioner cannot demonstrate that the state court's decision
3   was contrary to, or involved an unreasonable application of,
4   clearly established law as determined by the United States Supreme
5   Court.  See 28 U.S.C. § 2254(d).  Nor can Petitioner demonstrate
6   that the state court's decision relied on an unreasonable
7   determination of the facts.

8      First, the appellate court rejected Petitioner's claim by
9   concluding that CALCRIM 375 and CALCRIM 1401, taken together,
10  clearly informed the jury that proof by a preponderance of the
11  evidence that Petitioner committed certain uncharged offenses is
12  not sufficient to prove beyond a reasonable doubt that he committed
13  the charged crimes.  The court found that these instructions also
14  clearly informed the jury that, before Petitioner could be found
15  guilty of any charged crime, the evidence as a whole must establish
16  beyond a reasonable doubt that Petitioner was guilty of committing
17  that crime.

18     Second, the appellate court found unavailing Petitioner's
19  reliance on Gibson, in which the Ninth Circuit held that jury
20  instructions on prior uncharged offenses may violate due process
21  where they lessen the prosecution's burden of proof.  387 F.3d at
22  822.  In Gibson, the challenged instruction was the 1996 version of
23  CALJIC No. 2.50.01, which, as explained above, permits an inference
24  of guilt on a charged sexual offense based on evidence of a past
25  sexual offense.  The appellate court rejected Petitioner's reliance
26  on Gibson because the 1996 version of CALJIC No. 2.50.01 has since
27  been modified to comport with due process.  Op. at *8 (citing
28  People v. Falsetta, 21 Cal. 4th 903 (1999)).  The California

United States District Court

For the Northern District of California

Supreme Court has found that the 1999 revised version of CALJIC No. 2.50.01, given in combination with CALJIC No. 2.50.1,[2] cured any error in the older 1996 version of CALJIC No. 2.50.01, stating:

> We do not find it reasonably likely a jury could interpret the instructions to authorize conviction of the charged offenses based on a lowered standard of proof. Nothing in the instructions authorized the jury to use the preponderance-of-the-evidence standard for anything other than the preliminary determination whether defendant committed a prior offense . . . The instructions instead explain that, in all other respects, the People had the burden of proving defendant guilty "beyond a reasonable doubt." Any other reading would have rendered the reference to reasonable doubt a nullity.

People v. Reliford, 29 Cal. 4th 1007, 1016 (2003).

Here, the appellate court concluded that CALCRIM 375 was similar to the 1999 revised version of CALJIC No. 2.50.01 because it expressly indicated to the jury that a finding that Petitioner committed the uncharged offenses using a preponderance of the evidence standard was merely one item to be considered, along with all other evidence, and clearly stated that each element of the charged offenses had to be proven beyond a reasonable doubt. After

---

[2] CALJIC No. 2.50.1 states:

Within the meaning of the preceding instructions, the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed sexual offenses other than those for which he is on trial.

You must not consider this evidence for any other purpose unless you find by a preponderance of the evidence that a defendant committed a sexual offense.

If you find sexual offenses were committed by a preponderance of the evidence, you are nevertheless cautioned and reminded that before a defendant can be found guilty of any crime charged or any included crime in this trial, the evidence as a whole must persuade you beyond a reasonable doubt that the defendant is guilty of that crime.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

considering the record as a whole, the appellate court determined that Petitioner had not demonstrated a reasonable likelihood that CALCRIM 375 allowed the jury to misapply the law in a way that violated the constitution, resulting in a conviction that violated due process.  Instructing the jury with CALCRIM 375 did not violate Petitioner's due process rights because it did not permit a conviction upon less than proof beyond a reasonable doubt.  Given the trial court's explicit warning against confusing the lesser standard of proof for prior uncharged offenses with the required higher standard of proof for the charged crime, the appellate court was reasonable in rejecting Petitioner's challenge to CALCRIM 375. Petitioner has not shown that the appellate court's factual determinations were unreasonable.  Accordingly, his argument must fail under AEDPA, and this claim is DENIED.

<div align="center">CONCLUSION</div>

For the foregoing reasons, the Court DENIES the petition for a writ of habeas corpus on all claims.

Further, a Certificate of Appealability is DENIED.  See Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure.  See Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

Dated: 3/14/2012

CLAUDIA WILKEN
United States District Judge

**United States District Court**
For the Northern District of California